## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SHAUN QUINNEY, derivatively on behalf of WELBILT, INC., | |
| Plaintiff, | C.A. No. _____ |
| vs. | |
| HUBERTUS M. MUEHLHAEUSER, JOHN O, STEWART, HARESH SHAH, DINO J. BIANCO, JOAN K. CHOW, THOMAS D. DAVIS, CYNTHIA M. EGNOTOVICH, ANDREW LANGHAM, and BRIAN R. GAMACHE, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| WELBILT, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Shaun Quinney ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Welbilt, Inc. ("Welbilt" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Hubertus M. Muehlhaeuser, John O, Stewart, Haresh Shah, Dino J. Bianco, Joan K. Chow, Thomas D. Davis, Cynthia M. Egnotovich, Andrew Langham, and Brian R. Gamache (collectively, the "Individual Defendants," and together with Welbilt, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Welbilt, unjust enrichment, waste of corporate assets, and violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, he alleges the following based upon personal knowledge as to his and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Welbilt, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Welbilt's directors and officers from at least February 24, 2017 through the present (the "Relevant Period").

2.     Welbilt is a commercial foodservice equipment company that designs, manufactures, and supplies food and beverage equipment to a global commercial foodservice market. The Company operates over 20 manufacturing facilities worldwide and touts an array of products used by commercial and institutional foodservice operators such as restaurants, hotels, resorts, supermarkets, hospitals, and convenience stores.

3.     In 2015, Welbilt's former parent company, The Manitowoc Company, Inc. ("MTW"), announced a restructuring plan that would result in the creation of two independent, public companies with separate business operations, in the crane business and foodservice business respectively. MTW initiated this plan by reorganizing its business internally, allocating foodservice responsibilities to Manitowoc Foodservice, Inc., which spun-off into an independent public company in 2016 and changed its name to Welbilt in 2017.

4.     Welbilt sells its products and services through a global network of over 5,000 distributors, dealers, buying groups, and manufacturers' representatives. The Company reports operating results for markets across the globe. Specifically, Welbilt manages its business in three geographic reportable segments including the Americas, which includes the United States, Canada, and Latin America; EMEA, which includes European markets, the Middle East, and Africa and; APAC, which is principally comprised of markets in China, Australia, Japan, Philippines, Singapore, South Korea, Thailand, Indonesia, Taiwan, Hong Kong, Malaysia and New Zealand. The Company is required to prepare and present its consolidated financial statements in accordance with accounting principles generally accepted in the U.S. ("GAAP").

5.     Beginning at least in 2016, Welbilt's publicly issued financial statements contained material accounting errors related to the Company's income tax expenses and liabilities due to, *inter alia*, deficient internal controls relating to financial reporting, errors in the tax basis for a

foreign subsidiary, incorrect amortization of the intangible assets held by certain foreign subsidiaries, and untimely recording of certain intercompany transactions which culminated in a net understatement of Welbilt's (1) total current liabilities for December 31, 2016 by $3.1 million and by $7.8 million for December 31, 2017 and (2) income tax expenses for the year ended December 31, 2016 by $5.4 million and by $3.7 million for the year ended December 31, 2017 (the "Income Tax Understatements").

6.       On November 5, 2018, the Company filed a current report on a Form 8-K titled "Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review" (the "2018 Form 8-K") announcing that previously issued financial statements as of December 31, 2016 could no longer be relied upon due to "prior period errors" primarily related to certain income tax computations. Specifically, Welbilt disclosed that the Company discovered errors in the tax basis of a foreign subsidiary and incorrect amortization of intangible assets by the same entity which resulted in an understatement of the U.S. tax liability. Additionally, the 2018 8-K revealed that certain intercompany transactions were not timely recorded, which resulted in an incorrect recognition of income tax expenses and further understatements of U.S. tax liability.

7.       Due to these material errors, the Company announced it would be restating its consolidated financial statements to reflect corrections as of and for the year ended December 31, 2016 and revising the years ended December 31, 2015 and 2017. The 2018 8-K also stated that considering the errors and unreliability of the Company's prior financial statements, Welbilt determined that a material weakness relating to income taxes existed as of December 31, 2017 through September 30, 2018 and its internal controls over financial reporting and disclosure controls were therefore ineffective as of that date.

8.      On this news, the price per share of Welbilt stock fell the next two trading sessions by $5.32 or 27% from a closing price of $19.32 per share on November 2, 2018, to close at $14.00 on November 6, 2018.

9.      The Individual Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to make the Income Tax Understatements.

10.     Also during the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*: (1) the Company's internal controls related to financial reporting were deficient and ineffective; (2) Welbilt was erroneously recording the tax basis and amortization of intangible assets of its foreign subsidiaries; (3) consequently, the Company's financial statements were unreliable and; (4) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     The Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

12.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

13.     In light of the Individual Defendants' misconduct, which has subjected Welbilt, its former Chief Executive Officer ("CEO"), its Senior Vice President and Chief Financial Officer ("CFO"), and its former CFO to being named as defendants in a federal securities fraud class action

4

lawsuit pending in the United States District Court for the Middle District of Florida (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

14.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Company's former CEO's, CFO's, and former CFO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of Welbilt's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

16.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

21.     Venue is proper in this District because Welbilt and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

22.     Plaintiff is a current shareholder of Welbilt common stock and has continuously held Welbilt common stock since before the Relevant Period began.

### Nominal Defendant Welbilt

23.     Welbilt is a Delaware corporation with its principal executive offices at 2227 Welbilt Boulevard, New Port Richey, FL, 34655. Welbilt's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "WBT."

### Defendant Muehlhaeuser

24.     Defendant Hubertus M. Muehlhaeuser ("Muehlhaeuser") served as the Company's President and CEO from August 2015, and as a Company director from 2016 until his resignation on August 31, 2018. According to the Company's Schedule 14A filed with the SEC on March 14, 2018 (the "2018 Proxy Statement"), as of February 28, 2018, Defendant Muehlhaeuser beneficially

owned 125,092 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2018 was $19.81, Defendant Muehlhaeuser owned approximately $2.4 million worth of Welbilt stock.

25.     For the fiscal year ended December 31, 2017, Defendant Muehlhaeuser received $3,704,480 in compensation from the Company. This included $867,308 in salary, $1,825,045 in stock awards, $625,083 in option awards, $281,880 in Non-Equity Incentive Plan Compensation, and $105,164 in all other compensation.

26.     The Company's 2018 Proxy Statement stated the following about Defendant Muehlhaeuser:

> **Hubertus M. Muehlhaeuser.**[1] Mr. Muehlhaeuser has served as the Company's President and Chief Executive Officer since August 2015 and as a Director since the Spin-Off. Prior to joining the Company, from 2013 to 2015, Mr. Muehlhaeuser served as Managing Partner of Karl-H. Muehlhaeuser GmbH & Co KG (a subsidiary of Mühlhäuser Holding GmbH (Switzerland)), a leader in the development, production, distribution and service of rail-bound and trackless tunneling and mining equipment. From 2005 to 2012, Mr. Muehlhaeuser held various leadership positions at AGCO Corporation ("AGCO"), a leading manufacturer and distributor of agricultural equipment and related replacement parts, including Senior Vice President and General Manager, Europe/Africa/Middle East; Senior Vice President—Strategy & Integration; General Manager, Eastern Europe/Asia and General Manager—Engines. Prior thereto, Mr. Muehlhaeuser led the Global Strategy and Organization Practice at Arthur D. Little, Ltd., an international management consulting firm and also served as a member of the firm's Global Management Team and the firm's Managing Director, Switzerland. Additionally, Mr. Muehlhaeuser is a member of the Board of Directors of the National Association of Manufacturers (USA) and Cormoran de Bilbao S.L. (Spain), and he is the non-executive Chairman of the Board of Mühlhäuser Holding GmbH (Switzerland), where he is still the majority shareholder. Mr. Muehlhaeuser studied Business Administration at the European Business Schools in Oestrich Winkel and London, as well as the Universidad Argentina de la Empresa, and holds an M.B.A. from EBS University of Business and Law.
>
> <u>Key Qualifications and Skills</u>: As the President and Chief Executive Officer of Welbilt, Mr. Muehlhaeuser's day-to-day leadership of the business provides an invaluable contribution to the Board. His prior senior management experience in

---

[1] Emphasis in original unless otherwise noted in this Complaint.

equipment and manufacturing industries and his multi-functional expertise, including strategy and integration, operational execution, financial acumen, capital markets knowledge, and strong channel and brand management, offers Welbilt a unique set of skills as it positions itself for long-term, sustainable growth.

**Defendant Stewart**

27.     Defendant John O. Stewart ("Stewart") served as Welbilt's Senior Vice President and CFO from November 2015 until his retirement in May 2017. According to the 2018 Proxy Statement, as of February 28, 2018, Defendant Stewart beneficially owned 123,576 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2018 was $19.81, Defendant Stewart owned approximately $2.4 million worth of Welbilt stock.

28.     For the fiscal year ended December 31, 2017, Defendant Stewart received $2,113,731 in compensation from the Company. This included $207,692 in salary, $650,889 in stock awards, $237,666 in option awards, and $1,017,484 in all other compensation.

29.     The Company's Schedule 14A filed with the SEC on March 16, 2017 (the "2017 Proxy Statement") stated the following about Defendant Stewart:

**Mr. Stewart** was appointed Senior Vice President and Chief Financial Officer of Welbilt effective November 9, 2015. Prior to his appointment, his most recent position was Executive Vice President, Chief Financial Officer and Chief Administrative Officer of Hostess Brands, Inc., a manufacturer and distributor of cake and bread products, which he held from 2010 until May 2013. From May 2013 until his appointment with Welbilt, Mr. Stewart was retired. Before joining Hostess Brands, Inc. in 2010, Mr. Stewart served as the Executive Vice President and Chief Financial Officer of Dr. Pepper Snapple Group, Inc. (NYSE: DPS), a leading carbonated soft drinks company, from 2006 until 2010. From 1990 to 2005, Mr. Stewart served in various finance roles within the business of Diageo PLC (NYSE: DEO), a leading premium spirits business, including as the Chief Financial Officer of Diageo PLC's subsidiary Diageo North America, Inc. from 2001 until 2004. Mr. Stewart holds a Bachelor of Accountancy degree from the University of Glasgow and is a member of the Institute of Chartered Accountants of Scotland.

**Defendant Shah**

30.     Defendant Haresh Shah ("Shah") has served as the Company's Senior Vice President and CFO since May 1, 2017. Defendant Shah previously served as the Company's Vice President, Corporate Controller, and Chief Accounting Officer from June 2016 to April 2017. According to the 2018 Proxy Statement, as of February 28, 2018, Defendant Shah beneficially owned 3,684 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2018 was $19.81, Defendant Shah owned approximately $72,980 worth of Welbilt stock.

31.     For the fiscal year ended December 31, 2017, Defendant Shah received $800,575 in compensation from the Company. This included $343,946 in salary, $257,404 in stock awards, $86,575 in option awards, $81,474 in Non-Equity Incentive Plan Compensation, and $31,177 in all other compensation.

32.     The Company's 2018 Proxy Statement stated the following about Defendant Shah:

> Mr. Shah, 49, has served as Senior Vice President and Chief Financial Officer of the Company, since May 1, 2017 and, from June 2016 to April 2017, served as the Company's Vice President, Corporate Controller and Chief Accounting Officer. Prior to joining the Company, he served as Vice President, Corporate Controller of Syniverse Technologies, LLC, a mobile communication services leader in mobile interoperability, mobile communications and mobile expertise, from 2012 until May 2016. He previously served in financial leadership roles at Amkor Technology, Inc., a leading provider of outsourced semiconductor packaging and test services, including Vice President, International Finance, from 2009 until 2012. Prior thereto, he held positions with increasing responsibility at Alcatel-Lucent, a provider of internet protocol (IP) and cloud networking and ultra-broadband access, from 2000 until 2008, including serving as Controller, Asia Pacific and China — Convergence Business Group. Mr. Shah holds a B.B.A. degree in accountancy from Baruch College and is a Certified Public Accountant.

**Defendant Bianco**

33.     Defendant Dino J. Bianco ("Bianco") has served as a Company director since 2015. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee According to the 2018 Proxy Statement, as of February 28, 2018, Defendant Bianco beneficially

owned 13,056 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2018 was $19.81, Defendant Bianco owned approximately $258,639 worth of Welbilt stock.

34.     For the fiscal year ended December 31, 2017, Defendant Bianco received $212,063 in compensation from the Company. This included $105,000 in salary and $107,063 in stock awards.

35.     The Company's 2018 Proxy Statement stated the following about Defendant Bianco:

> **Dino J. Bianco.** Mr. Bianco has served as a Director, chairperson of the Audit Committee and member of the Compensation Committee since the Spin-Off. Since March 2018, Mr. Bianco has served as Chief Executive Officer of KP Tissue and Kruger Products L.P., a Canadian manufacturer of quality tissue products for North American household, industrial and commercial use. Formerly, Mr. Bianco served as Executive Vice President (2012 to April 2015) of Kraft Foods Group, Inc. ("Kraft") and President of its Beverages business (2013 to April 2015). Kraft (now known as The Kraft Heinz Company after a merger with the H.J. Heinz Company), is a North American consumer packaged food and beverage company. Prior to his 23-year career with Kraft, Mr. Bianco was employed by PricewaterhouseCoopers LLP. In addition, Mr. Bianco is a past chair of Food and Consumer Products of Canada, past member of the Board of The Grocery Foundation, and past member of the Board of Trustees of the United Way of Toronto. Additionally, Mr. Bianco has served as a director and Audit Committee chair of Andrew Peller Ltd. (TSX: ADW.A) from 2016 to 2017 and as a director of MTW from 2015 until the Spin-Off. Mr. Bianco holds a Bachelor of Commerce from the University of Toronto and is a Chartered Professional Accountant.

> Key Qualifications and Skills: Mr. Bianco brings over 25 years of financial, accounting, sales and marketing and senior management experience to our Board, including extensive experience with one of the largest food and beverage companies in North America and more recently as Chief Executive Officer at a Canadian manufacturing company. This experience is amplified by his service on relevant professional organizations.

**Defendant Chow**

36.     Defendant Joan K. Chow ("Chow") has served as a Company director since 2012. She also serves as Chair of the Compensation Committee and as a member of the Corporate Governance Committee. According to the 2018 Proxy Statement, as of February 28, 2018, Defendant Chow beneficially owned 25,078 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2018 was $19.81, Defendant Chow owned approximately $496,795 worth of Welbilt stock.

37.     For the fiscal year ended December 31, 2017, Defendant Chow received $216,563 in compensation from the Company. This included $109,500 in salary and $107,063 in stock awards.

38.     The Company's 2018 Proxy Statement stated the following about Defendant Chow:

**Joan K. Chow.** Ms. Chow has served as a Director, chairperson of the Compensation Committee and member of the Corporate Governance Committee since the Spin-Off. Since February 2016, Ms. Chow has served as Chief Marketing Officer of the Greater Chicago Food Depository. From 2007 to August 2015, Ms. Chow served as Executive Vice President and Chief Marketing Officer at ConAgra Foods, Inc., a North American packaged food company. From 1998 to 2007, Ms. Chow served in various marketing positions of increasing responsibility at Sears Holdings Corporation, including as Senior Vice President and Chief Marketing Officer of Sears Retail. Prior thereto, she served in leadership positions with Information Resources Inc. and Johnson & Johnson Consumer Products, Inc. Ms. Chow served on the Board of Feeding America, a leading hunger-relief charity in the United States, from 2008 to 2016. Additionally, Ms. Chow has served as a director and Human Resources & Corporate Governance Committee member of High Liner Foods (TSX: HLF) since 2017 and as a director of MTW from 2012 until the Spin-Off. Ms. Chow holds an M.B.A. from the Wharton School of the University of Pennsylvania and a Bachelor's degree from Cornell University.

Key Qualifications and Skills: Ms. Chow has extensive leadership experience in marketing, advertising, branding, consumer insights, and digital/social marketing. She also has significant knowledge of and experience with human resources and compensation matters, which she has gained through serving on the Boards of various public companies as well as a senior executive at ConAgra Foods. Additionally, Ms. Chow's direct knowledge of the Company's business before and after the Spin-Off provides the Board with valuable insight.

**Defendant Davis**

39.      Defendant Thomas D. Davis ("Davis") has served as a Company director since 2016. He also serves as a member of the Audit Committee and Compensation Committee. According to the 2018 Proxy Statement, as of February 28, 2018, Defendant Davis beneficially owned 8,142 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2018 was $19.81, Defendant Davis owned approximately $161,293 worth of Welbilt stock.

40.      For the fiscal year ended December 31, 2017, Defendant Davis received $195,563 in compensation from the Company. This included $88,500 in salary and $107,063 in stock awards.

41.      The Company's 2018 Proxy Statement stated the following about Defendant Davis:

**Thomas D. Davis.** Mr. Davis has served as a Director, member of the Audit Committee and member of the Compensation Committee since the Spin-Off. Mr. Davis has served as President and Chief Executive Officer of Viskase Companies, Inc. ("Viskase"), a meat casing company, since 2007, and also as its Chairman, since 2011. Viskase is majority owned by Icahn Enterprises, L.P., one of the Icahn Shareholders (as defined herein). From 2000 to 2006, Mr. Davis served as President and Chief Executive Officer of Specialty Foods Group, Inc., a producer of premium meat products. He also served in various executive positions with Smithfield Foods, Inc. from 1995 to 1999, and in various operational and financial roles with John Morrell & Company from 1980 until it was acquired by Smithfield Foods in 1995. Mr. Davis holds an M.B.A. from Benedictine University and a B.S. from SUNY-Plattsburgh.

Key Qualifications and Skills: Mr. Davis's experience as Chief Executive Officer at two food processing companies, as well as his operational and financial background in the food processing industry, provide a valuable perspective to our Board.

**Defendant Egnotovich**

42.      Defendant Cynthia M. Egnotovich ("Egnotovich") has served as a Company director since 2008. She has also served as Chairperson of the Board and as Chair of the Corporate

Governance Committee since 2016. According to the 2018 Proxy Statement, as of February 28, 2018, Defendant Egnotovich beneficially owned 89,246 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2018 was $19.81, Defendant Egnotovich owned approximately $1.7 million worth of Welbilt stock.

43.    For the fiscal year ended December 31, 2017, Defendant Egnotovich received $339,055 in compensation from the Company. This included $153,250 in salary and $185,805 in stock awards.

44.    The Company's 2018 Proxy Statement stated the following about Defendant Egnotovich:

**Cynthia M. Egnotovich.** Ms. Egnotovich has served as Chairperson of our Board and chairperson of the Corporate Governance Committee since the Spin-Off in March 2016. From July 2012 until her retirement in November 2013, Ms. Egnotovich served as President, Customer Service of Aerospace Systems of United Technologies Corporation ("UTC"), a diversified company that provides a broad range of high-technology products and services to the global aerospace and building systems industries. From 1986 to July 2012, Ms. Egnotovich held leadership roles of increasing significance at Goodrich Corporation, an aerospace manufacturer ultimately acquired by UTC, including Segment President of Nacelles and Interior Systems, Segment President of Engine Systems, Segment President of Electronic Systems and Segment President of Engine & Safety Systems. Additionally, Ms. Egnotovich has served as a director and Audit Committee member of Hexcel Corporation (NYSE: HXL) since 2015 and as a director of MTW from 2008 until the Spin-Off. Ms. Egnotovich holds a B.B.A. in Accounting from Kent State University and a B.S. in Biology from Immaculata College.

Key Qualifications and Skills: With nearly 30 years of relevant experience in finance, accounting, and senior management in various segments of large manufacturing companies, experience serving on the Boards of other public companies and direct knowledge of the Company's business before and after the Spin-Off, Ms. Egnotovich is well suited to serve on our Board and Corporate Governance Committee.

**Defendant Gamache**

45.     Defendant Brian R. Gamache ("Gamache") has served as a Company director since 2017. He also serves as a member of the Audit Committee and Compensation Committee. According to the 2018 Proxy Statement, as of February 28, 2018, Defendant Gamache beneficially owned 10,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2018 was $19.81, Defendant Gamache owned approximately $198,100 worth of Welbilt stock.

46.     For the fiscal year ended December 31, 2017, Defendant Gamache received $169,723 in compensation from the Company. This included $71,815 in salary and $97,908 in stock awards.

47.     The Company's 2018 Proxy Statement stated the following about Defendant Gamache:

> **Brian R. Gamache.** Mr. Gamache has served as a Director, member of the Audit Committee and member of the Compensation Committee since March 2017. Mr. Gamache currently serves as an advisor or consultant to several private equity firms and corporations, is a guest lecturer at Northwestern University's Kellogg School of Management and also is a member of the Dean's Council of the University of Florida's Warrington School of Business. Previously, Mr. Gamache served as the Chairman and Chief Executive Officer and a director of WMS Industries Inc., a designer, manufacturer and marketer of games for the casino and on-line gaming industries, from 2001 to 2013, when it was acquired by Scientific Games Corporation. Prior thereto, Mr. Gamache held various executive positions with Wyndham International, WHG Resorts and Casinos, Inc. (a subsidiary of WMS Industries Inc.), Marriott Hotel Corporation and Hyatt Hotels Corporation. Additionally, Mr. Gamache has been a director of KapStone Paper and Packaging Corporation (NYSE: KS) since 2009 and serves as the chair of their Nominating and Corporate Governance Committee. Mr. Gamache holds a B.S. in Business Administration from the University of Florida.
>
> Key Qualifications and Skills: Mr. Gamache brings expertise on organizational development, financial and brand management as well as sales and marketing experience to our Board. He has significant experience in implementing digital strategies in the fast-moving gaming industry, which is a great match with our connected kitchen strategy for commercial kitchen operations. He also brings a deep understanding of the hotel and hospitality industry, which is a key end market of the Company's product offerings.

### Defendant Langham

48.     Defendant Andrew Langham ("Langham") has served as a Company director since 2016. He also serves as a member of the Corporate Governance Committee and the Audit Committee. Defendant Langham's initial appointment to the Board took place as part of a settlement agreement connected with the Company's spin-off from MTW as an independent publicly traded company (the "Spin-Off") in 2016. According to the 2018 Proxy Statement, as of February 28, 2018, Defendant Langham beneficially owned 8,142 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on February 28, 2018 was $19.81, Defendant Langham owned approximately $161,293 worth of Welbilt stock.

49.     For the fiscal year ended December 31, 2017, Defendant Langham received $200,063 in compensation from the Company. This included $93,000 in salary and $107,063 in stock awards.

50.     The Company's 2018 Proxy Statement stated the following about Defendant Langham:

> **Andrew Langham.** Mr. Langham has served as a Director, member of the Corporate Governance Committee and member of the Audit Committee since the Spin-Off. Mr. Langham has served as General Counsel of Icahn Enterprises L.P., a diversified holding company engaged in a variety of businesses, including investment, automotive, energy, gaming, railcar, food packaging, metals, real estate and home fashion, since 2014. From 2005 to 2014, Mr. Langham was Assistant General Counsel of Icahn Enterprises. Prior thereto, Mr. Langham was an associate at the law firm of Latham & Watkins LLP focusing on corporate finance, mergers and acquisitions, and general corporate matters. Additionally, Mr. Langham has served as a director of Freeport McMoRan Inc. (NYSE: FCX) from 2015 to March 2018; CVR Partners LP (NYSE: UAN) since 2015; CVR Refining, LP (NYSE: CVRR) since 2014; CVR Energy, Inc. (NYSE: CVI) from 2014 to 2017; and Cheniere Energy, Inc. (NYSE MKT: LNG) since 2017. CVR Partners, CVR Refining and CVR Energy are each indirectly controlled by Carl C. Icahn. Mr. Icahn also has non-controlling interests in Freeport-McMoRan and Cheniere Energy through the ownership of securities. Mr. Langham received a B.A. from Whitman College, and a J.D. from the University of Washington.

<u>Key Qualifications and Skills</u>: Mr. Langham's legal background, particularly his expertise in corporate matters, finance, and mergers and acquisitions, provides a valuable perspective to our Board. His connection with the food packaging business provides additional insight as a Board member. As General Counsel of Icahn Enterprises L.P., he also brings relevant experience with corporate governance, compliance, and regulatory matters.

<u>Arrangement pursuant to which Director was Nominated to the Board</u>: Mr. Langham was initially appointed to the Board in connection with the Spin-Off. In accordance with the terms of the Settlement Agreement (the "Settlement Agreement") entered into by MTW with Carl C. Icahn, Icahn Partners Master Fund LP, Icahn Offshore LP, Icahn Partners LP, Icahn Onshore LP, Beckton Corp., Hopper Investments LLC, Barberry Corp., High River Limited Partnership, Icahn Capital LP, IPH GP LLC, Icahn Enterprises Holdings L.P. and Icahn Enterprises G.P. Inc (the "Icahn Shareholders") and which the Company subsequently joined. The Settlement Agreement provided the Icahn Shareholders with the option to cause MTW to appoint one designee of the Icahn Shareholders to our Board in connection with the Spin-Off. Mr. Langham has been nominated for election to the Board at our 2018 Annual Meeting of Stockholders in accordance with such Settlement Agreement.

## **<u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>**

51.     By reason of their positions as officers and/or directors of Welbilt  and because of their ability to control the business and corporate affairs of Welbilt, the Individual Defendants owed Welbilt and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Welbilt  in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Welbilt and its shareholders so as to benefit all shareholders equally.

52.     Each director and officer of the Company owes to Welbilt and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

53.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Welbilt, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

54.     To discharge their duties, the officers and directors of Welbilt were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

55.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Welbilt, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Welbilt's Board at all relevant times.

56.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to

disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

57. To discharge their duties, the officers and directors of Welbilt were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Welbilt were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to Welbilt's own Code of Conduct;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Welbilt conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Welbilt and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Welbilt's operations would comply with all

applicable laws and Welbilt's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.     Each of the Individual Defendants further owed to Welbilt and the shareholders the duty of loyalty requiring that each favor Welbilt's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

59.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Welbilt and were at all times acting within the course and scope of such agency.

60.     Because of their advisory, executive, managerial, and directorial positions with Welbilt, each of the Individual Defendants had access to adverse, non-public information about the Company.

61.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Welbilt.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

62.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

63.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

64.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Welbilt, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

65.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

66.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Welbilt and was at all times acting within the course and scope of such agency.

## WELBILT'S CODE OF CONDUCT

67.     The Company's Code of Conduct states that it:

> describes our Company's Core Values: Integrity, Passion, Teamwork, Entrepreneurship and Accountability. These values provide an ethical framework for our day-to-day actions and should inspire us as we contribute to the ongoing success of the Company. The Code also identifies those behaviors that are illegal, contrary to the Company's policies or inconsistent with our values. In all cases, the Code provides a way to determine whether our own behavior or conduct we see in others is acceptable at the Company.

68.     The Code of Conduct provides that the Company is committed to operating its business in accordance with the highest ethical standards, which at minimum includes compliance with "all applicable laws and regulations," stating in relevant part "[t]he standard of compliance is absolute. Yet, we also recognize that, while laws and regulations include requirements, they represent the minimum standard of ethical conduct, not the maximum. For example, the law requires that we not discriminate against any individual on the basis of such characteristics as race, age and gender. Our standard surpasses that minimum."

69.     Under a section titled, "Corporate Citizenship," the Code of Conduct emphasizes adherence to all laws, "except. . . in those few circumstances where local law may conflict with the U.S. Foreign Corrupt Practices Act or other critical U.S. laws."

70.     The Code of Conduct outlines under a section titled "Protection of Company Assets" that, "[t]he most important asset of the Company is its reputation for honesty and integrity. No employee action should work to the detriment of this cornerstone of the Company's success. Damage to our reputation can occur whenever any of our stakeholders—employees, suppliers,

customers, stockholders, and the community—perceive that we are engaged in an inappropriate action."

71.     In line with the Company's commitment to integrity, the Code of Conduct provides for certain policies regarding the integrity and disclosure of financial systems and accounts. Specifically, the Code of Conduct states,

> As noted earlier, our reputation is built on integrity: keeping our promises, doing the right thing, and being honest and forthright. To maintain our reputation, the Company places a high priority on ensuring that our commitment to integrity is demonstrated in all of our financial systems, business records, books of account and disclosures. Employees are required to meet the requirements as specified in the following policies:
>
> - Policies 103 and 114: Financial Reporting Accountability and Accounting Procedures
> - Policy 111: Required SEC Filings and Disclosures

72.     The Company's Code of Conduct highlights the importance of the Company's public image and provides that all public statements must be carefully controlled and coordinated, stating in relevant part, "All statements regarding corporate performance and other financial matters must be approved and coordinated by the Chief Financial Officer or the Vice President of Investor Relations."

73.     The Code of Conduct also provides reporting guidelines for suspected violations of laws, rules, regulations, or the Code of Conduct stating in relevant part:

> The Company encourages employees to report any suspected violations of laws, rules, regulations or the provisions of this Code, and will not allow retaliation for any report of a suspected violation that is made in good faith. Any person who becomes aware of, concerned about, or suspicious of any improper or questionable accounting, internal accounting controls or auditing matters, or otherwise has any concerns regarding any accounting, internal accounting controls or auditing matters of the Company, may communicate those concerns in the following manner:
>
> i) Website. Go to the Company's website at www.manitowocfoodservice.com and click on Compliance Hotline link, which is located in the Corporate Governance section in the Investor Relations portion of the website. If the sender desires to

remain anonymous, he/she should be sure not to include any personal or identifying information.

ii) Third Party Hotline. Call the Company's Corporate Governance Hotline at 844-600-0072 for calls placed within the United States and Canada or 800-603-2869 (preceded by the country code) for calls placed outside the United States and Canada. If the sender desires to remain anonymous, he/she should be sure not to include any personal or identifying information.

iii) EMEA. If located in Europe, the Middle East or Africa, in order to address European data protection requirements and language aspects, contact your country's local whistleblower address, which has been communicated by your country's local human
resources contact.

iv) General Counsel. Contact the General Counsel, by phone, email, fax or mail. . .

## WELBILT'S SUPPLEMENTAL CODE OF ETHICS

74.     The Company's Global Ethics Policy (the "Code of Ethics") states that it "governs the global business conduct of the directors, officers, and employees of Welbilt, Inc. (together with its subsidiaries and affiliates, the "Company") to ensure that they comply with the highest standards of ethics and integrity throughout the organization." The Code of Ethics applies to all directors, officers, and employees of the Company.

75.     The Code of Ethics provides that the "policy of the Company is to comply fully with all laws governing its operations and to conduct its affairs in keeping with the highest moral, legal, and ethical standards. Our worldwide reputation for performing our transactions with honesty is in itself a priceless Company asset."

76.     According to the Code of Ethics, all Company directors, officers, and employees must comply with certain enumerated rules and procedures, including in relevant part:

Honesty and Compliance with Laws. Our competition in the marketplace will be conducted honestly, and we will fully comply with all of our obligations to those with whom we do business and insist they do the same. We will scrupulously refrain from any violation, or even an appearance of possible violation, of applicable laws, rules and regulations, including (without limitation) those outlined in this policy.

Financial and Reporting Accountability and Financial and Accounting Directives.
There will be full compliance with the Financial and Reporting Accountability
Guidelines and with the Financial and Accounting Directives set forth in this policy
below

77.     The Code of Ethics expands upon general guidelines and directives related to

financial reporting and accountability, stating in relevant part:

Disclosure Controls and Procedures. The Chief Executive Officer of the Company
will establish, oversee and periodically review, assess and, if appropriate, modify
disclosure controls and procedures (as defined in Rule 13a-14 promulgated under
the Securities Exchange Act of 1934), which are designed to ensure that
information required to be disclosed by the Company in reports that it files or
submits to the Securities and Exchange Commission under the Securities Exchange
Act of 1934 is accurately recorded, processed, summarized, and reported in
compliance with the substantive requirements and time periods specified in the
Securities and Exchange Commission's rules and forms.

Internal Controls and Procedures. The Chief Executive Officer and the Chief
Financial Officer of the Company will be responsible for establishing, maintaining,
monitoring, periodically assessing, and appropriately modifying internal controls
and procedures for financial reporting designed to ensure that transactions are
properly authorized, assets are safeguarded against unauthorized or improper use,
and transactions are properly recorded and reported so as to permit the preparation
of the Company's financial statements to accurately reflect the Company's
financial condition and results of operations in conformity with generally accepted
accounting principles. Every officer and employee of the Company who is involved
with financial and accounting functions shall adhere to these controls and
procedures.

Questionable Payments. Any payment that may be questionable will be carefully
reviewed to determine if it is both legal and appropriate.

Governs all Company Operations. Company projects, offices, and joint ventures,
both in this country and abroad, are subject to these policies, particularly as they
relate to accurate recordkeeping, audit, and tax reporting.

Internal Audit. Company internal audit staff will audit to ensure these policies are
being followed. Emphasis will be on ensuring that there are no cases of illegal or
improper payments in the United States or abroad.

* * *

Accurate, Open Records. All cash, bank accounts, investments, and other assets of
the Company, which includes its subsidiaries and affiliates (each such entity

hereinafter referred to as a "Covered Company"), must be recorded accurately on the official books of that Covered Company. Bank accounts should be opened or closed only upon the prior written approval of the Office of the Treasurer of the Company. Anonymous ("numbered") accounts are not permitted.

78.     The Individual Defendants violated the Code of Conduct and the Code of Ethics (the "Codes") by causing the Company to make the Income Tax Understatements and engaging in the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

79.     Welbilt purports to be one of the world's leading commercial foodservice equipment companies. The Company manufactures, designs, and supplies food and beverage equipment to a global commercial foodservice market.

80.     The Company spun-off from its former parent-company MTW in March 2016 and publicly listed itself on the NYSE under the name Manitowoc Foodservice, Inc. In March 2017, the Company changed its name to Welbilt as part of its strategic repositioning after the Spin-Off.

81.     Welbilt operates 21 manufacturing facilities and sells its products through a global network of over 5,000 distributors, dealers, buying groups and manufacturers' representatives. The Company's global footprint requires it to report a wide range of operating results, which the Company divides into three reportable segments: the Americas (United States, Canada, and Latin America); EMEA (Europe, Middle East, and Africa) and; APAC (comprised of several markets located throughout Asia, Australia, and New Zealand). Most of the Company's revenue is derived from its customers located in the Americas. The Company is required to prepare and present its consolidated financial statements in accordance with GAAP.

**The Income Tax Understatements**

82.     During the Company's third fiscal quarter ended September 30, 2018, Welbilt identified a number of errors related to the tax basis of a foreign subsidiary and incorrect amortization of certain intangible assets that impacted certain internal tax determinations and led to the Company understating its U.S. tax liability. Welbilt also discovered that a number of intercompany transactions were not timely recorded, which resulted in incorrect income tax expense appreciation and further contributed to the Company's understatement of U.S. tax liability.

83.     On November 3, 2018, the Company determined that its previously consolidated financial statements as of and for the year ended December 31, 2016 and related reports published thereafter concerning the same time period were no longer reliable. The Company stated the non-reliability of its prior financial statements was due to prior period errors related to computing income taxes in connection with intercompany distributions by foreign entities and intercompany obligations with certain agreements. Certain of the prior period errors were previously identified by the Company as out of period adjustments, but in aggregate, the errors resulted in a misstatement of net earnings on the Company's consolidated financial statements.

84.     The Company's preliminary estimates after uncovering the impact of these errors included decreasing its net earnings by $1 to $2 million for the year ended December 31, 2015, by approximately $7 million to $9 million for the year ended December 31, 2016, and by approximately $1 million to $2 million for the year ended December 31, 2017. The Income Tax Understatements were material and required the Company to revise its previous financial statements and restate them to reflect corrections and established that the Company's internal controls over financial reporting were deficient and ineffective.

85.     On November 20, 2018, the Company filed an amendment to its annual report for the year ended December 31, 2017 on a Form 10-K/A with the SEC (the "10-K Amendment"). The 10-K Amendment revealed, as set forth in the table below, that Welbilt had understated income tax expenses for the year ended December 31, 2016 by $5.4 million and by $3.7 million for the year ended December 31, 2017.

| (in millions, except per share data) | Year Ended December 31, 2016 | | |
| --- | --- | --- | --- |
| | As Reported | Adjustment | As Restated |
| Net sales | $ 1,456.6 | $ (0.5) | $ 1,456.1 |
| Cost of sales | 923.8 | (1.5) | 922.3 |
| Gross profit | 532.8 | 1.0 | 533.8 |
| Selling, general and administrative expenses | 290.1 | 1.0 | 291.1 |
| Loss on early extinguishment of debt | — | 2.7 | 2.7 |
| Other expense (income) — net | 9.1 | (0.1) | 9.0 |
| Earnings before income taxes | 104.8 | (2.6) | 102.2 |
| Income taxes | 25.3 | 5.4 | 30.7 |
| Net earnings | 79.5 | (8.0) | 71.5 |
| | | | |
| **Per share data** | | | |
| Earnings per share — Basic | $ 0.58 | $ (0.06) | $ 0.52 |
| Earnings per share — Diluted | $ 0.57 | $ (0.06) | $ 0.51 |

| (in millions, except per share data) | Year Ended December 31, 2017 | | |
| --- | --- | --- | --- |
| | As Reported | Adjustment | As Revised |
| Loss on early extinguishment of debt | $ 4.4 | $ (2.7) | $ 1.7 |
| Other expense (income) — net | 9.0 | 0.1 | 9.1 |
| Earnings before income taxes | 118.8 | 2.6 | 121.4 |
| Income taxes | (15.2) | 3.7 | (11.5) |
| Net earnings | 134.0 | (1.1) | 132.9 |
| | | | |
| **Per share data** | | | |
| Earnings per share — Basic | $ 0.96 | $ — | $ 0.96 |
| Earnings per share — Diluted | $ 0.95 | $ (0.01) | $ 0.94 |

86.     In addition, the Company understated its total current liabilities for December 31, 2016 by $3.1 million and by $7.8 million for December 31, 2017, as set forth in the table below.

| (in millions) | December 31, 2017 | | | December 31, 2016 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | As Reported | Adjustment | As Revised | As Reported | Adjustment | As Restated |
| Accrued expenses and other liabilities | $ 161.7 | $ 7.8 | $ 169.5 | $ 174.5 | $ 3.1 | $ 177.6 |
| Total current liabilities | 290.1 | 7.8 | 297.9 | 313.1 | 3.1 | 316.2 |
| Long-term debt and capital leases | 1,232.2 | — | 1,232.2 | 1,278.7 | 2.6 | 1,281.3 |
| Deferred income taxes [1] | 92.3 | (1.0) | 91.3 | 137.8 | 7.2 | 145.0 |
| Total non-current liabilities | 1,439.9 | (1.0) | 1,438.9 | 1,499.5 | 9.8 | 1,509.3 |
| Additional paid-in capital (deficit) | (63.3) | 8.6 | (54.7) | (72.0) | 1.4 | (70.6) |
| Retained earnings | 204.5 | (15.4) | 189.1 | 70.5 | (14.3) | 56.2 |
| Total equity (deficit) | 110.4 | (6.8) | 103.6 | (43.5) | (12.9) | (56.4) |

87.     In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly caused the Company to make the Income Tax Understatements, despite the Company's assurance that its internal controls over financial reporting were effective. As a result of the Income Tax Understatements, the Individual Defendants caused the Company to understate income tax expenses, total current liabilities, and misstate other material financial information to the public, indicating that the Company had lax or non-existent financial reporting controls and disclosure policies and protocols, and that the Company's internal controls and procedures related to financial reporting  were ultimately inadequate and ineffective for much of its existence as an independent publicly traded company.

88.     Also in breach of their fiduciary duties, The Individual Defendants failed to conduct adequate due diligence over the Company's internal controls over financial reporting and disclosure, causing them to fail to discover and/or timely correct numerous errors related to income tax expenses, amortization, and untimely recording of intercompany transactions.

28

89.     In further breach of their fiduciary duties, the Individual Defendants made the false and misleading statements below concerning, *inter alia*, the Income Tax Understatements.

**False and Misleading Statements**

*February 24, 2017 Form 10-K*

90.     On February 24, 2017 the Company filed with the SEC its annual report for the fiscal year ended December 31, 2016 on a Form 10-K (the "2016 10-K"), which was signed by Defendants Muehlhaeuser, Stewart, Shah, Bianco, Langham, Chow, Davis, and Egnotovich.

91.     The 2016 10-K included Welbilt's financial results for the fiscal year ended December 31, 2016 and stated that the Company's internal control over financial reporting as of December 31, 2016 was effective. Specifically, the 2016 10-K stated that:

> Our management, with the participation of the . . . Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of the end of the period covered by this report. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2016, the end of such period, our disclosure controls and procedures are effective in recording, processing, summarizing, and reporting, within the time periods specified in the Commission's rules and forms, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, and that such information is accumulated and communicated to the Company's management, including its Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure.

92.     Attached to the 2016 10-K were certifications pursuant to Rules 13a-14(a) and 15d under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Muehlhaeuser and Stewart attesting to the accuracy of the 2016 10-K.

*March 16, 2017 Proxy Statement*

93.     The Company filed its 2017 Proxy Statement with the SEC on March 16, 2017. Defendants Muehlhaeuser, Bianco, Chow, Davis, Egnotovich, Langham, and Gamache solicited

the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

94.     The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[w]e have adopted a written code of conduct, or the "Code of Conduct," that applies to all of our employees. The Code of Conduct reflects our commitment to operate our business in a manner that meets the highest ethical standards. It includes or refers to policies and rules that cover ethical and legal practices for nearly every aspect of our business. A copy of the Code of Conduct is posted on our web site at www.welbilt.com."

95.     The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein and the Individual Defendants' failures to report violations of the Code of Conduct.

96.     The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, designed to "link [Welbilt's] pay program to key metrics of [its] business strategy and stockholder value . . ." while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

97.     The 2017 Proxy Statement also failed to disclose, *inter alia*: (1) the Company's internal controls related to financial reporting were deficient and ineffective; (2) Welbilt was erroneously recording the tax basis and amortization of intangible assets of its foreign subsidiaries;

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

(3) consequently, the Company's financial statements were unreliable and; (4) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### May 9, 2017 Form 10-Q

98.    On May 9, 2017, Welbilt filed with the SEC its quarterly report on Form 10-Q for its first fiscal quarter ended March 31, 2017 signed by Defendants Muehlhaeuser and Shah (the "2017 1Q 10-Q"). The 2017 1Q 10-Q included the Company's financial results for the quarter and stated specifically that Welbilt's controls and procedures were effective. Specifically, the 2017 1Q 10-Q stated:

> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as such term is defined in Rules 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing, and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, and that such information is accumulated and communicated to the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure.

99.    Attached to the 2017 1Q 10-Q were SOX certifications signed by Defendants Muehlhaeuser and Shah attesting to the accuracy of the 2017 1Q 10-Q.

### August 9, 2017 Form 10-Q

100.    On August 9, 2017, Welbilt filed with the SEC its quarterly report on Form 10-Q for its second fiscal quarter ended June 30, 2017 signed by Defendants Muehlhaeuser and Shah (the "2017 2Q 10-Q"). The 2017 2Q 10-Q included the Company's financial results for the quarter

and stated specifically that Welbilt's controls and procedures were effective. Specifically, the 2017

2Q 10-Q stated:

> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as such term is defined in Rules 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing, and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, and that such information is accumulated and communicated to the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure.

101.    Attached to the 2017 2Q 10-Q were SOX certifications signed by Defendants

Muehlhaeuser and Shah attesting to the accuracy of the 2017 2Q 10-Q.

### *November 7, 2017 Form 10-Q*

102.    On November 7, 2017, Welbilt filed with the SEC its quarterly report on Form 10-

Q for its third fiscal quarter ended September 30, 2017 signed by Defendants Muehlhaeuser and

Shah (the "2017 3Q 10-Q"). The 2017 3Q 10-Q included the Company's financial results for the

quarter and stated specifically that Welbilt's controls and procedures were effective. Specifically,

the 2017 3Q 10-Q stated:

> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as such term is defined in Rules 13a-15(e) and 15(d)-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of the period covered by this report. Based on such evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, the Company's disclosure controls and procedures are effective in recording, processing, summarizing, and reporting, on a timely basis, information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act, and that such information is accumulated and communicated to the Chief Executive

Officer and Chief Financial Officer, as appropriate, to allow timely discussions regarding required disclosure.

103.    Attached to the 2017 3Q 10-Q were SOX certifications signed by Defendants Muehlhaeuser and Shah attesting to the accuracy of the 2017 3Q 10-Q.

### March 1, 2018 Form 10-K

104.    On March 1, 2018 the Company filed with the SEC its annual report for the fiscal year ended December 31, 2017 on a Form 10-K (the "2017 10-K"), which was signed by Defendants Muehlhaeuser, Shah, Bianco, Langham, Chow, Davis, Egnotovich, and Gamache.

105.    The 2017 10-K included Welbilt's financial results for the fiscal year ended December 31, 2017 and stated that the Company's internal control over financial reporting as of December 31, 2017 was effective. Specifically, the 2017 10-K stated that:

> Under the supervision and with the participation of the Company's Chief Executive Officer and Chief Financial Officer, management carried out an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2017, based on the framework set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control—Integrated Framework (2013)* (the "2013 framework"). Based on that evaluation, management concluded that, as of December 31, 2017, the Company's internal control over financial reporting was effective.

106.    Attached to the 2017 10-K were SOX certifications signed by Defendants Muehlhaeuser and Shah attesting to the accuracy of the 2017 10-K.

### March 14, 2018 Proxy Statement

107.    The Company filed its 2018 Proxy Statement with the SEC on March 14, 2018. Defendants Muehlhaeuser, Bianco, Chow, Davis, Egnotovich, Langham, and Gamache solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are

108.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that,

We have adopted a written Code of Conduct and a Global Ethics Policy that apply to all of our employees and directors and reflect our commitment to operate our business in a manner that meets the highest ethical standards. These policies are posted on the Investor Relations section of our website at http://ir.welbilt.com. Any waiver of these policies granted to executive officers or directors may be made only by the Board or a board committee, and if required, any such waivers or amendments will be disclosed on the Corporate Governance section of our website on a timely basis.

109.    The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct and Code of Ethics were not followed, as evidenced by the numerous false and misleading statements alleged herein and the Individual Defendants' failures to report violations of the Codes.

110.    The Individual Defendants also caused the 2018 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, designed to "link [Welbilt's] pay program to key metrics of [its] business strategy and stockholder value . . ." while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

111.    The 2018 Proxy Statement also failed to disclose, *inter alia*: (1) the Company's internal controls related to financial reporting were deficient and ineffective; (2) Welbilt was erroneously recording the tax basis and amortization of intangible assets of its foreign subsidiaries; (3) consequently, the Company's financial statements were unreliable and; (4) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements regarding the

---

based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact at all relevant times.

### *May 8, 2018 Form 10-Q*

112.    On May 8, 2018, Welbilt filed with the SEC its quarterly report on Form 10-Q for its first fiscal quarter ended March 31, 2018 signed by Defendants Muehlhaeuser and Shah (the "2018 1Q 10-Q"). The 2018 1Q 10-Q included the Company's financial results for the quarter and stated specifically that Welbilt's controls and procedures were effective. Specifically, the 2018 1Q 10-Q stated:

> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of this reporting period. Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of this reporting period, the Company's disclosure controls and procedures were effective.

113.    Attached to the 2018 1Q 10-Q were SOX certifications signed by Defendants Muehlhaeuser and Shah attesting to the accuracy of the 2018 1Q 10-Q.

### *August 9, 2018 Form 10-Q*

114.    On August 9, 2018, Welbilt filed with the SEC its quarterly report on Form 10-Q for its second fiscal quarter ended June 30, 2018 signed by Defendants Muehlhaeuser and Shah (the "2018 2Q 10-Q"). The 2018 2Q 10-Q included the Company's financial results for the quarter and stated specifically that Welbilt's controls and procedures were effective. Specifically, the 2018 2Q 10-Q stated:

> The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, have evaluated the effectiveness of the Company's disclosure controls and procedures as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act") as of the end of this reporting period. Based on this evaluation, the Company's Chief

Executive Officer and Chief Financial Officer have concluded that, as of the end of this reporting period, the Company's disclosure controls and procedures were effective.

115.    Attached to the 2018 2Q 10-Q were SOX certifications signed by Defendants Muehlhaeuser and Shah attesting to the accuracy of the 2018 2Q 10-Q.

116.    The statements in ¶¶ 90-92, 98-106, and 112-115 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose *inter alia*: (1) the Company's internal controls related to financial reporting were deficient and ineffective; (2) Welbilt was erroneously recording the tax basis and amortization of intangible assets of its foreign subsidiaries; (3) consequently, the Company's financial statements were unreliable and; (4) the Company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

### November 5, 2018 Form 8-K and Press Release

117.    On November 5, 2018, the Company filed a current report with the SEC on a Form 8-K titled "Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review." The 2018 8-K revealed that the Company's independent registered public accounting firm, PricewaterhouseCooper LLP ("PwC") determined that the Company's previously issued financial statements for the fiscal year ended December 31, 2016 and PwC's report concerning those statements as well as its report related to those statements filed in Welbilt's 2017 10-K were no longer reliable due to prior period errors. Specifically, the 2018 8-K stated:

> On November 3, 2018, the Audit Committee of the Board of Directors of Welbilt, Inc. (the "Company"), after considering the recommendation of management and after consulting with PricewaterhouseCoopers LLP, the Company's independent registered public accounting firm ("PwC"), determined that the Company's

previously issued consolidated financial statements as of and for the year ended December 31, 2016 and the related report of PwC as it relates to such period as included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 should no longer be relied upon because of prior period errors. The errors primarily relate to the computation of income taxes associated with intercompany distributions by foreign entities and intercompany obligations in accordance with underlying agreements.

118.    The 2018 8-K disclosed that the Company purportedly identified certain errors in the third quarter of the fiscal year ended December 31, 2018 and outlined other recording errors discovered by the Company, including intercompany transactions that were not timely recorded. The 2018 8-K stated in relevant part:

During the third quarter of 2018, the Company identified errors in the tax basis of a foreign subsidiary and incorrect amortization of the intangible assets held by the same entity. These errors, which related to a U.S. tax election made in connection with a 2008 acquisition, impacted the tax determinations of certain intercompany distributions between foreign subsidiaries, thereby resulting in an understatement of the U.S. tax liability.

In addition, the Company discovered certain intercompany transactions were not recorded on a timely basis. While these transactions have no impact to the Company's consolidated pre-tax book income, they did result in an incorrect recognition of income tax expense or benefit recognized in each applicable jurisdiction, thereby resulting in an understatement of the U.S. tax liability.

119.    The 2018 8-K continued, providing the Company's estimated impact on the tax errors, noting that the Company had not completed its review and therefore, the estimates were subject to change, stating:

Based on its preliminary assessment, the Company estimates the aggregate impact of these tax related errors, along with other previously identified errors that were recorded as out of period adjustments, on consolidated net earnings, calculated in accordance with accounting principles generally accepted in the U.S., to be as follows: decrease by approximately $1.0 million to $2.0 million for the year ended December 31, 2015, decrease by approximately $7.0 million to $9.0 million for the year ended December 31, 2016 and decrease by approximately $1.0 million to $2.0 million for the year ended December 31, 2017. Because the Company has not yet fully completed its review, the estimated impact set forth above is preliminary and subject to change.

The Company intends to file an amended Annual Report on Form 10-K for the year ended December 31, 2017 (the "Form 10-K/A") as soon as practicable. The consolidated financial statements of the Company as of and for the year ended December 31, 2016 will be restated, and as of and for the years ended December 31, 2015 and 2017 are expected to be revised, in each case, to reflect the correction of these tax errors. In addition, certain other adjustments, previously determined to be immaterial, individually and in the aggregate, will also be corrected in the restated and revised consolidated financial statements included in the Form 10-K/A. All relevant footnotes to the consolidated financial statements in the Form 10-K/A will also be restated or revised to reflect the items discussed above. In addition, all previously filed 2018, 2017 and 2016 quarterly information are expected to be revised.

120.     Furthermore, the 2018 8-K established that the Company's internal controls over financial reporting and disclosure were ineffective, deficient, and would receive an adverse opinion from PwC over said controls as of December 31, 2017, stating specifically:

The Company has reassessed the effectiveness of the Company's internal control over financial reporting and disclosure controls and procedures in light of the errors described above. The Company has determined that a material weakness relating to income taxes existed as of December 31, 2017 and through September 30, 2018, and therefore the Company's internal controls over financial reporting and disclosure controls and procedures for income taxes were ineffective. In addition, the Company will also restate management's report on internal control over financial reporting and its evaluation of disclosure controls and procedures (included in its Annual Report on Form 10-K for the fiscal year ended December 31, 2017) and will receive an adverse opinion on the internal control over financial reporting as of December 31, 2017 from PwC. Since management has not completed its evaluation of the impact of the errors on its internal control over financial reporting, there can be no assurance that additional control deficiencies which represent material weaknesses will not be identified. Further details and remediation plans will be included in the Form 10-K/A.

The Audit Committee of the Board of Directors has discussed the matters disclosed in this Item 4.02 with PwC.

121.     Also on November 5, 2018, Welbilt issued a press release attached to a Form 8-K announcing the Company's financial results for its third quarter ended September 30, 2018. The press release included a statement regarding the Company's restatements and revisions to previously issued financial statements and data. Specifically, the press release stated:

During the third quarter of 2018, the Company identified errors in the tax basis of a foreign subsidiary and incorrect amortization of the intangible assets held by the same

entity. These errors, which related to a U.S. tax election made in connection with a 2008 acquisition, impacted the tax determinations of certain intercompany distributions between foreign subsidiaries thereby resulting in an understatement of the U.S. tax liability. In addition, the Company discovered certain intercompany transactions were not recorded on a timely basis. While these intercompany transactions have no impact to the Company's consolidated pre-tax book income, they do impact the income tax expense. As management determined the impact of these and other previously identified errors to 2016 to be material, it is restating its 2016 financial results. Management is expecting to revise its financial statements for 2017 and 2015. In addition, all previously filed 2018, 2017 and 2016 quarterly information are expected to be revised.

The financial results included in this press release reflect the estimated impact of these restatements and revisions and should be considered preliminary. For reconciliations between previously reported and revised amounts relating to the periods presented in this release, refer to the tables appearing at the end of this press release under the heading "Revision of Prior Period Results." Additional information regarding the revision will be included in the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30. 2018.

As a result of the errors identified, the Company has determined that a material weakness in its internal control over financial reporting related to accounting for income taxes exists. Accordingly, the Company will restate management's report on internal control over financial reporting and its evaluation of disclosure controls and procedures (included in it Annual Report on Form 10-K for the fiscal year ended December 31, 2017) and will receive an adverse opinion on the internal control over financial reporting as of December 31, 2017 from PricewaterhouseCoopers LLP.

For more information, please see the Current Report on Form 8-K that the Company previously filed on November 5, 2018.

122.    On this news, the Company's price per share dropped $5.32 over the next two trading sessions from a closing price of $19.32 on November 2, 2018 to close at $14.00 on November 6, 2018, a decline of 27%.

123.    On November 9, 2018, the Company filed a notification of late filing with the SEC on a Form 12b-25 which reported that the Company had experienced unexpected delays in the filings of its quarterly report on Form 10-Q for the period ended September 30, 2018, stating in relevant part:

The Company is working to prepare the Form 10-K/A and complete the restatement and revisions described above as soon as practicable and, therefore, is not able to complete its interim unaudited financial statements and file the Form 10-Q on or prior to the due date without unreasonable effort or expense. The Company currently expects that it will be able to conclude the remaining work in time to file the Form 10-Q within the five day extension period provided by Rule 12b-25.

124.    On November 20, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2018, which disclosed certain prior period errors connected with the Income Tax Understatements including but not limited to the following:

- $2.7 million understatement of the loss incurred on debt repayments made in 2016, which was initially identified and corrected for as an out-of-period correction in 2017;

- In 2016, subsequent to the initial accounting for the spin-off from the Company's former parent, the Company incorrectly reduced the carrying value of deferred tax liabilities through a credit to retained earnings of $7.2 million. In 2017, the Company adjusted for this error through an out-of-period adjustment to additional paid-in capital, which then resulted in a misclassification between cumulative retained earnings and additional paid-in capital;

- Cash flows misclassification of $4.0 million related to withholding taxes associated with stock-based compensation has been revised as cash flows from financing activities instead of operating activities in the unaudited consolidated statement of cash flows for the nine months ended September 30, 2017; and

- $3.6 million and $4.5 million understatement of foreign currency translation adjustments in the three months ended March 31, 2017 and the six months ended June 30, 2017, respectively, related to the accounting for an interest rate swap contract, which was originally identified and corrected for as an out-of-period adjustment in the three months ended September 30, 2017.

125.    Also on November 20, 2018, the Company filed the 10-K Amendment. The 10-K Amendment contained the Company's substantial revisions and restatements to its prior financial statements following the Income Tax Understatements. The 10-K Amendment also stated the following regarding the Company's internal controls over financial reporting:

Management has reassessed its evaluation of the effectiveness of its internal control over financial reporting as of December 31, 2017, based on the framework established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). As a result of that reassessment, management identified a material weakness and, accordingly, has concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2017. For a description of the material weakness in internal control over financial reporting and actions taken, and to be taken, to address the material weakness, see Part II, Item 9A. "Controls and Procedures" of this Annual Report on Form 10-K/A. In addition, the Company's independent registered public accounting firm has restated their report on the Company's internal control over financial reporting and issued an adverse opinion.

## DAMAGES TO WELBILT

126.    As a direct and proximate result of the Individual Defendants' conduct, Welbilt has lost and expended, and will lose and expend, many millions of dollars.

127.    Such losses include those incurred due to the Income Tax Understatements.

128.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its former CEO, its CFO, and its former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

129.    Such losses include, but are not limited to, handsome compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

130.    As a direct and proximate result of the Individual Defendants' conduct, Welbilt has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

131.     Plaintiff brings this action derivatively and for the benefit of Welbilt to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Welbilt, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

132.     Welbilt is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

133.     Plaintiff is a current shareholder of Welbilt and has continuously held Welbilt common stock since before the Relevant Period began. Plaintiff will adequately and fairly represent the interests of Welbilt in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

134.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

135.     A pre-suit demand on the Board of Welbilt is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Bianco, Chow, Davis, Egnotovich, Langham, and Gamache (the "Director-Defendants"), and non-parties Janice L. Fields and William C. Johnson (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time this action was commenced.

136.     Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

137.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the Income Tax Understatements and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

138.    Additional reasons that demand on Defendant Bianco is futile follow. Defendant Bianco has served as a Company director since 2015. He also serves as Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Bianco receives handsome compensation, including $212,063 during the fiscal year ended December 31, 2017. As a long-time trusted Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bianco signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. For these reasons, too, Defendant Bianco breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.     Additional reasons that demand on Defendant Chow is futile follow. Defendant Chow has served as a Company director since 2012. She also serves as Chair of the Compensation Committee and as a member of the Corporate Governance Committee. Defendant Chow receives handsome compensation, including $216,563 during the fiscal year ended December 31, 2017. As a long-time Company director she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Chow signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. For these reasons, too, Defendant Chow breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

140.     Additional reasons that demand on Defendant Davis is futile follow. Defendant Davis has served as a Company director since 2016. He also serves as a member of the Audit Committee and Compensation Committee. Defendant Davis receives handsome compensation, including $195,563 during the fiscal year ended December 31, 2017. As a Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Davis signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. For these reasons, too, Defendant Davis breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Egnotovich is futile follow. Defendant Egnotovich has served as a Company director since 2016. She also serves as Chairperson of the Board and as Chair of the Corporate Governance Committee. Defendant Egnotovich receives handsome compensation, including $339,055 during the fiscal year ended December 31, 2017. As a Company director, Chairperson of the Board, and Chair of the Corporate Governance Committee, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Egnotovich signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. For these reasons, too, Defendant Egnotovich breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Gamache is futile follow. Defendant Gamache has served as a Company director since 2017. He also serves as a member of the Audit Committee and Compensation Committee. Defendant Gamache receives handsome compensation, including $169,723 during the fiscal year ended December 31, 2017. As a Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Gamache signed, and thus personally made the false and misleading statements in, the 2017 10-K. For these reasons, too, Defendant Gamache breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Langham is futile follow. Defendant Langham has served as a Company director since 2016 when he was appointed by the Board in connection with the Spin-Off. He also serves as a member of the Corporate Governance Committee and the Audit Committee. Defendant Langham receives handsome compensation, including $200,063 during the fiscal year ended December 31, 2017. As a Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Langham signed, and thus personally made the false and misleading statements in, the 2016 10-K and 2017 10-K. For these reasons, too, Defendant Langham breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.    Additional reasons that demand on the Board is futile follow.

145.    Demand in this case is excused because the Director-Defendants control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

146.    Defendants Bianco, Davis, Langham, and Gamache (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Audit Committee Charter, the Audit Committee Defendants bear responsibility for, *inter alia*,

the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations. The Audit Committee Defendants failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to make the Income Tax Understatements and allowing the Company to issue false and misleading press releases and file false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

147.    Additionally, the Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and should have ensured that the Company maintained adequate financial oversight and internal controls over its disclosures and financial reporting to prevent the Income Tax Understatements. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

148.    In violation of the Codes, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In violation of the Codes, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

149.    Welbilt has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

Welbilt any part of the damages Welbilt suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

150.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

151.    The acts complained of herein constitute violations of fiduciary duties owed by Welbilt officers and directors, and these acts are incapable of ratification.

152.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Welbilt. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Welbilt, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists,

will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

153.    If there is no directors' and officers' liability insurance, then the Directors will not cause Welbilt to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

154.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

155.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

157.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

158.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

159.    Under the direction and watch of the Director-Defendants, the 2017 and 2018 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*: (1) the Company's internal controls related to financial reporting were deficient and ineffective; (2) Welbilt was erroneously recording the tax basis and amortization of intangible assets of its foreign subsidiaries; (3) consequently, the Company's financial statements were unreliable and; (4) the Company failed to maintain internal controls.

160.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, designed to "link [Welbilt's] pay program to key metrics of [its] business strategy and stockholder value . . .".while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

161.    The Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations and make accurate and non-misleading public disclosures. By engaging issuing false

and misleading statements to the investing public, the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

162.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

163.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Muehlhaeuser, Bianco, Chow, Davis, Egnotovich, Langham, and Gamache, which allowed them to continue breaching their fiduciary duties to Welbilt.

164.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

165.    Plaintiff on behalf of Welbilt has no adequate remedy at law.

**<u>SECOND CLAIM</u>**

**Against Individual Defendants for Breach of Fiduciary Duties**

166.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Welbilt's business and affairs.

168.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

169.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Welbilt.

170.    In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly caused the Company to make the Income Tax Understatements.

171.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

172.    In further breach of their fiduciary duties owed to Welbilt, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*: (1) the Company's internal controls related to financial reporting were deficient and ineffective; (2) Welbilt was erroneously recording the tax basis and amortization of intangible assets of its foreign subsidiaries; (3) consequently, the Company's financial statements were unreliable and; (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

173.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

174.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and

52

omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

175.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

176.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

177.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Welbilt has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

178.    Plaintiff on behalf of Welbilt has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

179.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

180.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Welbilt.

181.     The Individual Defendants either benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Welbilt that was tied to the performance or artificially inflated valuation of Welbilt, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

182.     Plaintiff, as a shareholder and a representative of Welbilt, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

183.     Plaintiff on behalf of Welbilt has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

184.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

185.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

186.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

187.     Plaintiff on behalf of Welbilt has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Welbilt, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Welbilt;

(c)     Determining and awarding to Welbilt the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Welbilt and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Welbilt and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Welbilt to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Welbilt restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: March 15, 2019

Of Counsel:

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Liaison Counsel for the Plaintiff*